UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF INGRAM BARGE COMPANY, AS OWNER OF THE ING4727, PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>No. 05-4419<br><br>SECTION "C" |

ORDER


Before the Court is the United States' Motion to Dismiss for lack of subject matter jurisdiction (Rec. Doc. 88). The government contends that claimants have failed to exhaust their administrative remedies as required for this Court to assert jurisdiction under various federal statutes including the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680 ("FTCA"). For the following reasons, the motion is **GRANTED**.


Background:


The allegations in this case arise out of the damage caused by the flooding that ravaged New Orleans after Hurricane Katrina. In particular, this action concerns the injuries to people and property resulting from the flooding of the Industrial Canal, the Mississippi River Gulf Outlet ("MRGO"), and the Gulf Intracoastal Waterway ("GICW") which was allegedly caused

1

by breaches in the levees and floodwalls that contain those waterways. The precise cause of the levee and floodwall breaches and the resultant flooding is a matter of substantial debate and impacts the outcome of the jurisdictional question.

Claimants' various filings amount to the following three specific claims against the United States:

1.) Defective design and construction of the Industrial Canal floodwall by the USACE (Rec. Doc. 12).

2.) Failure by the USACE and the United States Coast Guard ("USCG") to order the intentional sinking of the Ingram barge in the face of an approaching Category 5 hurricane (Rec. Doc. 12).[1]

3.) Negligent design, construction, and maintenance of the MRGO and the levee and floodwall systems along the MRGO, GICW, and Industrial Canal. (Rec. Doc. 108).

The Law:

Whether or not the Court has jurisdiction to hear the various claims raised against the United States depends on the source of that jurisdiction. There are three principal statutes which could plausibly confer jurisdiction.[2] They are the FTCA, the Suits in Admiralty Act, 46 U.S.C. §

---

[1] Claimants have yet to articulate precisely how the United States incurred a duty to look after a barge which was owned and managed by private companies. For purposes of this motion, however, the Court will assume the claimants can show that the United States had such a responsibility.

[2] In an effort to circumvent the FTCA and AEA exhaustion requirements, claimants have named a myriad of other asserted sources of jurisdiction. The government is correct for the reasons it stated in its reply memoranda that the claims raised under those other statutes and provisions are fraught with jurisdictional defects and do not save claimants from having to exhaust their FTCA and AEA claims.

742 ("SAA"), and the Admiralty Extension Act, 46 U.S.C. § 740 ("AEA").  While each of the three statutes contain an explicit waiver of sovereign immunity, the statutes differ as to the procedural requirements that must be met before the Court has jurisdiction to entertain the suit.  The next section describes the purpose, jurisdictional scope and procedural requirements of each of the three statutes before applying them to the claims raised in this case.

The FTCA:

The FTCA makes the United States liable for the negligent acts of its employees.  The government is correct to argue that § 2675 requires that administrative remedies be exhausted before a suit may be filed against the government under this statute.  Failure to do so leaves "the district court . . . without subject matter jurisdiction."  Price v. United States, 81 F.3d 520, 521 (5th Cir. 1996).  Further, courts "must strictly construe the statute, any ambiguities will be resolved in favor of the sovereign."  McLaurin v. United States, 392 F.3d 774, 780 (5th Cir. 2004).  As noted by the Fifth Circuit,"[S]uits filed [under the FTCA] must be filed in exact compliance with the terms of consent . . ."  Gregory v. Mitchell, 634 F.2d 199 (1981).  Suits that claim some sort of tortious conduct by the United States generally arise under the FTCA and such claims therefore generally require exhaustion.  The SAA, however, provides an exception to the exhaustion requirement for admiralty and maritime claims against the United States, including maritime torts.

The SAA:

The SAA waives sovereign immunity for admiralty proceedings against the United States.  Unlike the FTCA, the SAA contains no statutory requirement that claims be administratively exhausted before being filed in court.  By the express terms of the FTCA, the FTCA "shall not apply to . . . [a]ny claim for which a remedy is provided by the Suits in Admiralty Act."  28 U.S.C. § 2680(d).  Courts interpreting this language have concluded that claims which could be maintained in admiralty under the SAA are not actionable under the FTCA.  See McCormick v. United States, 680 F.2d 345 (5th Cir. 1982).  Determining whether a claim arises under the SAA or FTCA involves the application of a standard admiralty jurisdictional analysis, such as that set forth in Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995).

The AEA:

The AEA provides: "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, *caused by a vessel on navigable water*, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. § 740 (emphasis added). The AEA's purpose was nearly exclusively to overrule "cases holding that there is no admiralty jurisdiction when a negligently operated ship on navigable waters collides with a bridge or pier causing substantial property damage."  Adams v. Harris County, Tex., 316 F.Supp. 938 (D.C. Tex. 1970).  It is undisputed that the damages alleged in this case occurred on land, satisfying the AEA requirement that the "damage or injury be done or consummated on land."  However, the caselaw makes clear that the AEA only applies

4

when the injury was caused "by a vessel" and "her appurtenances." Egorov, et. al., v. Terriberry, Carroll, et. al., 183 F.3d 453, 456 (5th Cir. 1999). The AEA contains an explicit administrative exhaustion requirement that mirrors that of the FTCA.

In sum, negligence claims against the United States that do not arise under this Court's admiralty jurisdiction are filed pursuant to the FTCA and require administrative exhaustion. Negligence claims against the United States that *do* arise under this Court's admiralty jurisdiction will require exhaustion only if the allegation involves damages on land *caused by a vessel*. If the claim alleges damage on land caused by a vessel, the claim arises under the AEA and requires administrative exhaustion. If the claim does not involve damage caused by a vessel, but nonetheless still arises under the Court's admiralty jurisdiction, as claimants contend, the claim is made pursuant to the SAA and does not require administrative exhaustion.[3]

Jurisdictional Analysis of barge-related claims:

Throughout history, Congress and the Supreme Court have continuously reshaped the

---

[3] As a factual matter, the Court finds that claimants have not in fact fulfilled the procedural administrative requirements set forth in the various statutes under which they seek jurisdiction. Claimants contend that a letter sent on October 12, 2005 to the Army Corps of Engineers constitutes the filing of an administrative claim. This letter is clearly a FOIA request which does not constitute a proper administrative claim. The filing of a deficient administrative claim is tantamount to no filing at all. Industrial Indemnity Co. v. United States, 504 F.Supp. 394 (E.D.Cal. 1980). Claimants additionally argue that they subsequently filed a proper administrative claim (as early as January 10, 2006) which they claim was "denied" by the agency via a letter to claimants' counsel Mr. O'Dwyer which stated, "Your clients have not filed a valid FTCA administrative claim" citing procedural deficiencies. Whether or not claimants' January 10th submissions constitute a valid administrative claim, they certainly have not been finally denied by the agency, nor has six months passed since a valid claim was filed. The statutory requirements to establish jurisdiction in this case have not been met.

scope of the federal judiciary's authority to hear admiralty cases.  See, e.g. Grubart, Inc. v. Great Lakes Dredge & Dock, 513 U.S. 527, 532 (1995) (describing history of admiralty jurisdiction); Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249 (1972); Foremost Insurance Co. v Richardson, 457 U.S. 668 (1982); Sisson v. Ruby, 497 U.S. 358 (1990).  Presently, in order to invoke federal admiralty jurisdiction under 28 U.S.C. 1333(1), a party must satisfy each of the so-called "location" and "connection"[4] tests.  Grubart, 513 U.S. at 534; see also In re Madison Coal & Supply Co., Inc., 321 F.Supp.2d 809, 812 (S.D.W.Va. 2003)("Failure to establish either the location or the connection test is fatal to an assertion of admiralty jurisdiction.").

The location test, which emerges in part from the AEA, asks "whether the tort occurred on navigable waters or whether injury suffered on land was caused by a vessel on navigable water."  Grubart, 513 U.S. at 534; see also 46 U.S.C. § 740.  Courts read the "caused by" language of the statute to require the traditional tort law concept of "proximate cause."  Margin v. Sea-Land Services, Inc., 812 F.2d 973, 976 (5th Cir. 1987)("The vessel or its defective appurtenances must be the proximate cause of the accident.  This court has refused to extend the reach of the Act absent proximate cause"); See also Grubart, 513 U.S. at 536 ("The Act uses the phrase 'caused by,' which more than one Court of Appeals has read as requiring what tort law has traditionally called 'proximate causation.'").

The connection test flows from the Supreme Court admiralty jurisprudence culminating in its opinion in Sisson.  The test has two parts.  First, a court must "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce."  Grubart, 513 U.S. at 534 (quoting Sisson, 497 U.S. at 363-

---

[4] The "connection" test is often referred to as the "nexus" test.  See, e.g., Complaint of Nolty Theriot, Inc., 841 F.Supp. 209 (S.D.Tex. 1994).

64)(internal citations and quotations omitted).  Second, "a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity."  Id. (quoting Sisson, 497 U.S. at 364-65)(internal citations and quotations omitted).See Sisson, 497 U.S. at 362-67.  In applying the two-part Sisson inquiry, courts must bear in mind that "protecting commercial shipping is at the heart of admiralty jurisdiction." Id. at 362.

      The barge-related claims are similar to those of Grubart itself where jurisdiction was found arising under the AEA.  Grubart involved flooding from the Chicago River which caused damage in the basements of buildings in downtown Chicago, among other places.  The flood was allegedly caused by a "crane, sitting on a barge in the river next to a bridge" which was used to drive piles into the riverbed above a freight tunnel which later collapsed, causing water to flow through the tunnel into certain buildings.  Id. at 529-30.  The Court characterized the incident as "*damage by a vessel in navigable water to an underwater structure*."  Id. at 539 (emphasis added).  Indeed, claimants have alleged the classic situation to which the AEA was intended to apply: a vessel that collides with a land-based structure causing damage on land.  See, e.g., Loeber v. Bay Tankers, Inc., 924 F.2d 1340 (5th Cir. 1991); Turner Terminals Inc. v. United States, 177 F.2d 844 (5th Cir. 1949).  Claimants' allegation that the United States failed to intentionally sink the barge, which then ran into the levee, falls squarely under the AEA, which has an administrative exhaustion requirement.  Failure to comply with the requirement leaves this Court without jurisdiction, and that claim is therefore **DISMISSED**.

Jurisdictional Analysis of non-barge related claims:

The non-barge related claims -- defective design of the various levees and waterway systems discussed above -- as alleged raise an atypical set of circumstances in admiralty jurisprudence that call for a reexamination of the history and purpose of admiralty jurisdiction. When a vessel causes navigable waters to spill onto the land and damage land-based structures and individuals, the maritime nexus is obvious, and explicitly contemplated by statutes like the AEA. Here, the proximate cause of the damage is unrelated to any vessel and yet the central importance of navigable waterways in the events of this case injects an undeniable maritime flavor. The Court is thus faced with the relatively novel question of whether admiralty jurisdiction could somehow extend to include claims involving land-based damage without any involvement of a vessel. After a careful review of the history and development of admiralty jurisprudence, it does not appear that the scope of admiralty jurisdiction was intended to encompass the allegations made in this case. Doctrinally speaking, this case fails under the second part of the Grubart inquiries – that is, the claimants have failed to show a "substantial relationship to traditional maritime activity." Grubart, 513 U.S. at 534.[5]

To assert admiralty jurisdiction over these claims would not further the general purpose for which admiralty jurisdiction exists. Fundamentally, admiralty jurisdiction exists to allow federal courts to oversee and protect maritime commerce. Commentators and courts agree that

---

[5]The claimants assert that this case should be analyzed according to the four-part test laid out in Kelly v. Smith, 485 F.2d 520 (5th Cir. 1973). There are two fundamental flaws with the claimants' argument. First, Kelly and its test were explicitly abrogated by Grubart. Grubart, 513 U.S. at 544-545. Second, the claimants' application of the outdated test conflates their various claims against the United States by relying heavily on the vessel's involvement in the damage. This jurisdictional analysis separates the various claims made by the claimants, as one must, and this particular portion assumes no vessel involvement in the injuries sustained.

the "business of shipping" is at the heart of maritime law and admiralty jurisdiction.  See Black, Admiralty Jurisdiction: Critique and Suggestion, 50 COLUM.L.REV. 259 (1950)(suggesting that the proper allocation of admiralty jurisdiction in tort should be "all those cases seeking relief for tortious conduct with respect to the subject matter of . . . injuries to vessels or other maritime subjects, or injuries to persons taking place in connection with the conduct of the business of shipping."); Atlantic Transport Co. v. Imbrovek, 234 U.S. 52 (1914)(finding "the relation of the wrong to maritime service, navigation, and to commerce on navigable waters" sufficient to assert admiralty jurisdiction); McGuire v. City of New York, 192 F.Supp. 866 (D.C.N.Y. 1961) "(Admiralty law is, in fact, the law of commerce.  It was engendered as a result of the needs of commerce and flourished because of those same needs. Where it was feared that local ordinances or decisions might unduly impinge on international or interstate commerce, local statutes were held inapplicable in the face of the need for uniformity in maritime law.  The touchstone has been whether the action, tort for example, was not merely one of local concern but was in fact a thing having an intimate relation with navigation and interstate and foreign commerce. . . . *But the guide to admiralty jurisdiction must be the needs of the sea or the needs of seagoing commerce*.")(emphasis added).  Additionally, admiralty jurisprudence places special emphasis on the involvement of vessels in the assertion of admiralty jurisdiction.  See Robinson, Admiralty, § 8 (1939) ("Merely because events occur upon navigable waters does not put them within the admiralty and maritime jurisdiction. Transactions are 'maritime' only when in some way connected with a 'vessel.'"); Benedict, Admiralty § 61 (6th ed. 1940) ("Maritime causes naturally center around the ship, the great agent of maritime enterprise and affairs.").; McGuire, 192 F.Supp. at 871 (collecting cases and noting, "The cases, with varying degrees of specificity,

have adopted the necessity of a vessel as part of their permanent background.")

It is for those reasons that land-based structures such as piers and docks have been "consistently deemed extensions of land," Victory Carriers, Inc. v. Law, 404 U.S. 202, 206-207 (1971) and therefore outside the scope of admiralty jurisdiction. In affirming a dismissal for want of admiralty jurisdiction where an action *in rem* was filed against a vessel which had crashed into a drawbridge, the Supreme Court asserted in The Troy:

> That it appears from the averments of the libel that the bridge alleged to have been injured was a structure on land, for purposes of land travel and convenience exclusively, not erected, maintained, or operated in any sense or in any degree in aid of navigation, but, on the contrary, an obstruction and impediment to the navigation of a public navigable water channel and highway, a part of the public waters of the United States, then and there navigable to ships engaged in commerce and navigation.

208 U.S. 321 (1908).

This remains true in the situation more analogous to this case where the claim is that the land-based structure itself was defective. In In re Silver Bridge Disaster Litigation, the Southern District of West Virginia considered whether maritime law could apply to certain claims against the United States filed under the FTCA when a federally owned bridge collapsed causing numerous deaths in the navigable waters of the Ohio River. Applying a standard jurisdictional analysis, the court ruled that the case lacked the requisite maritime nexus. In particular, it held, "[T]he persons injured were not performing maritime functions or roles; the automobiles and trucks *and the bridge* were not maritime instrumentalities; nor were the causes of the injuries maritime, although death or injury may well have been ultimately caused by the impact of hitting the Ohio River or drowning in it." In re Silver Bridge Disaster Litigation, 381 F.Supp. 381, 943

(S.D.W.Va. 1974) (emphasis added).

A levee is a structure fixed to the land whose fundamental purpose is to protect the land-based community from flood waters.  See, e.g., http://en.wikipedia.org/wiki/Levee ("The main purpose of an artificial levee is to prevent flooding of the adjoining countryside. . .").  Although its existence may have some impact on the nature of the water it confines, it is a stretch to claim that levees are built for reasons substantially related to maritime commerce.  This type of structure is therefore distinguishable from other fixed land-based structures like beacons and lighthouses whose purpose has been found by courts to be closely related to the business of the sea.  See United States v.Evans, 195 U.S. 361 (1904)(Reversing a dismissal for want of jurisdiction where a vessel ran into and destroyed a beacon, noting "It is enough to say that we now are dealing with an injury to *a government aid to navigation* from ancient times subject to the admiralty,-a beacon emerging from the water,-injured by the motion of the vessel. . .") (emphasis added).  A levee is more akin to those structures like bridges, whose fixed land-based nature and non-maritime purpose have been found not to need the protection of a uniform body of federal law that is accorded vessels which roam the sea for business purposes.

Even were the Court to find that levees serve a dual purpose -- one of which being related to maritime commerce -- there is no support in the caselaw for asserting admiralty jurisdiction in this case.  Indeed, the arguments raised by claimants in this case resemble those already considered, and rejected, by the Fifth Circuit.  Adams v. Harris County, Tex. involved damages sustained by a motorcyclist who crashed into part of a drawbridge which crossed Cedar Bayou, a navigable stream.  452 F.2d 994 (5th Cir. 1971).  The bridge itself was permanently connected to the roadway and suspended over the water by permanent pilings driven into the channel below.

Adams, 452 F.2d at 995.  At the time of the accident, the bridge was raised to allow a small pleasure boat to pass underneath.  Id.  The Fifth Circuit in Adams noted the fact that "the sole and exclusive function of a drawbridge . . . is to allow maritime traffic to pass along navigable waters."  Id. at 997.  Further, the court in that case considered the relevance of the fact that a vessel was traveling underneath the bridge at the time of the accident, thus strengthening the relation to maritime commerce..  Nonetheless, the Adams court rejected what it considered a novel argument that "the relationship of [the] injuries was so substantially related to maritime commerce as to be embraced by admiralty jurisdiction."  Id. at 997.  The court found it dispositive of the jurisdictional question that "the injuries in question occurred on a permanently fixed extension of land and in the absence of any maritime causation other than the approach of a vessel, without more."  Id.  Thus, the potentially maritime flavor of the structures involved in this accident is insufficient, by itself, to give this Court admiralty jurisdiction over the non-barge related claims.  The Court thus finds that those claims arise under the FTCA, not the SAA, and they are accordingly **DISMISSED** for failure to exhaust administrative remedies.

    New Orleans, Louisiana, this 24th day of May, 2006.

                                            HELEN G. BERRIGAN
                                            UNITED STATES DISTRICT JUDGE