**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN THE MATTER OF THE                                 CIVIL ACTION
COMPLAINT OF INGRAM BARGE
COMPANY, AS OWNER OF THE                      No. 05-4419
ING4727, PETITIONING FOR
EXONERATION FROM OR                                SECTION "C"
LIMITATION OF LIABILITY

<u>OPINION</u>

Phase I, the privity or knowledge of the petitioners in limitation, of this matter

was tried before the Court, without a jury, on June 4, 2007 and June 5, 2007 and

subsequently taken under advisement.  Having considered the testimony and evidence

adduced at trial, the record and the law, the Court finds that Ingram Barge Company

("Ingram") did not successfully proved by a preponderance of the evidence that it did

not have privity or knowledge of every putative act of negligence and every putative

unseaworthy condition that allegedly resulted in the breakaway of the ING4727.   The

Court also finds that Unique Towing, Inc. ("Unique") and Joseph C. Domino, Inc.

("Domino") did not successfully prove by a preponderance of the evidence that they

did not have privity or knowledge of every putative act of negligence and every

putative unseaworthy condition that allegedly resulted in the breakaway of the ING4727.

<u>BACKGROUND</u>

On August 26, 2005 a barge owned by Ingram, the ING4727, arrived at Lafarge North America, Inc.'s ("LNA"), New Orleans, Louisiana facility on the Inter Harbor Navigational Canal ("IHNC"). The ING4727 was carrying a full load of dry cement. LNA's employees began unloading the cement at 12:20 p.m. on August 26, 2005. *See* Exhibit 102. The unloading procedure was completed between 8:00 a.m. and 9:00 a.m. on August 27, 2005. Testimony of Edward Busch.

Sometime on August 27, 2005, LNA's employees became aware that Hurricane Katrina was forecasted to impact the New Orleans, Louisiana area. *Id.* At that time, LNA personnel began to prepare for the storm. As part of the preparation, the terminal operations assistant and acting terminal manager, Edward Busch ("Busch") called Zito Fleeting ("Zito") and left a message for them to pick up the now empty ING4727.[1] *Id.* However, he did not call Ingram to let them know that the barge was empty. *Id.* LNA did not receive a return phone call from Zito, nor did Zito pickup the ING4727. *Id.*

---

[1]     Zito is the fleeting company with which Ingram contracts for the delivery, pickup and fleeting of its barges in the New Orleans, Louisiana area.

2

After the ING4727 was emptied, it remained moored to the LNA dock.  Another Ingram barge, the ING4745 was moored to the other side of the ING4727.  *Id.*  At that time, the ING4745 was full.  Busch, a man with approximately twenty-three (23) years of experience in the wharfing of barges, determined that the mooring configuration of the ING4727 and the ING4745 was unsafe. *Id.*  Specifically, he was concerned that, with the predicted storm surge, the empty ING4727 would not have enough slack to move freely if it were not moved to the outside of the full ING4745.  *Id.*  Accordingly, around 10:00 a.m. on August 27, 2005, Busch contacted Domino, a marine transportation broker, to arrange for a tugboat to reverse, or "flip," the positions of the ING4727 and the ING4745, so that the ING4745 would be next to the dock and the ING4727 moored on the outside of the ING4745. *Id.* The only instruction Busch gave Domino's dispatcher, David Castaing ("Castaing"), was to flip the barges. Testimony of Edward Busch and David Castaing.  He did not mention anything about the moorings that held the ING4727 to the ING4745. *Id.*

Castaing dispatched a tug owned by Unique, the M/V REGINA H, to flip the barges.  Testimony of David Castaing. He told the captain, Captain Raymond Grabert ("Captain Grabert"), to report to LNA, flip the barges and secure the loaded barge, the ING4745, to the dock. *Id.*  Castaing did not contact his supervisor or the M/V REGINA

3

H's owner, Richard Charles Heck ("Heck").  Testimony of David Castaing and Gerald McNeill.

The M/V REGINA H, with Captain Grabert and a deck hand, Eric Thigpen ("Thigpen") were on duty,  arrived at LNA's facility.  Testimony of Captain Grabert and Eric Thigpen.  The crew of the M/V REGINA H did not encounter any LNA employee at the dock.  *Id.* They found the ING4727 moored to the dock and the ING4745 moored to the ING4727 with three single part ropes.  *Id*. The tug successfully flipped the barges and moored the ING4745 to the dock. *Id*.  Captain Grabert then asked Thigpen if there was enough slack to make the lines between the barges two part lines, which Thigpen told him there was not.  Testimony of Eric Thigpen.   There were extra mooring lines aboard the M/V REGINA H, for securing tows and to provide to customers who request and pay for them.  Testimony of Captain Grabert.  However, LNA did not request or pay for additional mooring lines, so Captain Grabert sent Thigpen to the LNA dock to search for more lines.  Testimony of Captain Grabert and Eric Thigpen.  Thigpen found one additional rope and used it to further secure the ING4745 to the dock.  Testimony of Eric Thigpen.  Captain Grabert phoned Castaing when the job was finished.  Testimony of David Castaing and Captain Grabert.  Captain Grabert told Castaing that the job was completed, but did not mention anything about the moorings that held the ING4727 to

4

the ING4745 or any other details of the job at LNA.  *Id*.

Also, on August 27, 2006, Stanley Vernon Cook ("Cook"), Ingram's maintenance manager for the Apalachicola, Florida to Brownsville, Texas area went to the LNA facility in New Orleans, Louisiana.  Testimony of Stanley Cook.  Cook testified that he was at LNA to check the barge covers and provide extra line to tie them down if necessary.[2]  He also testified that he was not there to inspect the barges or their moorings.  When Cook returned to his office in Reserve, Louisiana, he did not notify anyone at Ingram about what had transpired at LNA.[3]  *Id*.

Hurricane Katrina made landfall on August 29, 2005.  When the storm struck, the ING4727 broke free from her moorings.  The ING4727 was later found in the Lower Ninth Ward of New Orleans, Louisiana.  The claimants, residents of the affected areas, allege that the ING4727 broke through the flood wall of the IHNC and caused flooding in the Lower Ninth Ward and parts of St. Bernard Parish, Louisiana.  The vessel owners filed this limitation of liability proceedings asserting, in part, that they did not have

---

[2]      Barge covers are fiberglass covers which are used to cover the cargo that is being carried by an otherwise open hatch barge.

[3]      Cook was not asked nor did he testify at trial as to whether or not he saw the moorings that held the ING4727 to the ING4745 or in what position the barges were moored when he was at LNA.

privity or knowledge of any alleged negligence.[4] *See* Rec. Doc. 1 and Rec. Doc. 1 of

consolidated proceeding 06-3313.

Due to the complexity of this action, the Court determined that the matter would

be tried in phases.  Rec. Doc. 210. Phase I is to address the privity or knowledge of those

parties who have asserted admiralty petitions for limitation of liability.[5]  *Id.*  Because the

determination of actual negligence or unseaworthiness is reserved for later phases of

the proceedings, the Court is to determine the vessel owners' privity or knowledge of

putative negligence and putative unseaworthiness.  In other words, the Court is to

assume that whatever actions, omissions or conditions that the claimants allege were

negligent or constituted unseaworthiness were negligent actions or unseaworthy

conditions.  Then the Court will determine whether or not the vessel owners had privity

or knowledge of that alleged negligence or unseaworthiness.

---

[4]     They also assert that they are entitled to exoneration from liability, in other words, that they were not negligent.  *See* Rec. Doc. 1 and Rec. Doc. 1 of consolidated proceeding 06-3313.

[5]     As described below, usually, in a limitation of liability proceeding, the claimants first prove which acts of negligence or unseaworthiness caused the accident. Then, the vessel owners are charged with proving that they did not have privity of knowledge of that negligence or unseaworthiness.

## LIMITATION OF LIABILITY

Ingram, Unique and Domino argue that their liability should be limited to the

post-incident values of the ING4727 and the M/V REGINA H, respectively, pursuant to

46 U.S.C. § 183-189.  The language of the statute allows for limitation of liability when

the vessel owner has no privity or knowledge of the acts which caused the damage.

Limitation of liability, in this sense, is meant to protect the owner of a vessel from tort

damages where the owner played no part in the injury.  Specifically, the limitation of

liability statute, 46 U.S.C. § 183(a), provides that:

> [t]he liability of the owner of any vessel, whether American
> or foreign, for any embezzlement, loss, or destruction by any
> person of any property, goods, or merchandise shipped or
> put on board of such vessel, or for any loss, damage, or
> injury by collision, or for any act, matter, or thing, loss,
> damage, or forfeiture, done, occasioned, or incurred, without
> the privity or knowledge of such owner or owners, shall not,
> except in the cases provided for in subsection (b) of this
> section, exceed the amount or value of the interest of such
> owner in such vessel, and her freight then pending.

As stated above, Domino is not a vessel "owner," but rather a marine

transportation broker.  However, an "owner" for the purposes of limitation of liability is

"one who is subjected to a shipowner's liability because of his exercises of dominion

over [i.e., relationship to] the vessel. *See In re: Shell Oil Co.*, 780 F.Supp. 1068, 1089

(E.D.La. 1991).   In other words, an operator with significant management and

7

operational control over a vessel may seek exoneration from or limitation of liability when it acts as a manager of the vessel or acquires work for and dispatches the vessel. *See In re: American Milling Co., Ltd*., 409 F.3d 1005, 1014 (8th Cir. 2005).  Unique supplied the crew for the M/V REGINA H.  Also, Unique's owner, Heck, boarded the vessel weekly, provided the captain with his phone number with instructions to contact him in the case of emergency and spoke with Domino's president almost daily.  Testimony of Gerald McNeill and Captain Grabert.  However, by oral agreement the vessel was solely in Domino's service and Domino acquired all of her work, dispatched her to jobs, set the standards for training her crew, sent the bills for her work and received a commission for each job that the vessel performed. *Id*.  Also, Unique's owner had to communicate with Domino regarding all aspects  of the vessel.  Testimony of Gerald McNeill. These facts taken together show that Domino had substantial control over the M/V REGINA H and can be considered an "owner" of the M/V REGINA H for the purpose of limitation of liability. *See Complaint of B.F.T. No. Two Corp*., 433 F.Supp. 854, 871-73 (E.D.Pa. 1977); *In re Oil Spill By the AMOCO CADIZ*, 954 F.2d 1279, 1302 (7th Cir. 1992); *Birmingham Southeast LLC v. M/V MERCHANT PATRIOT*, 124 F.Supp.2d 1327, 1388-39 (S.D.Ga. 2000); *American Milling*, 409 F.3d at 1016-1017.

      In order for the vessel owners, Ingram, Unique and Domino, to prevail on their

8

claims for limitation of liability, once the claimants prove that negligence or unseaworthiness caused the accident, they must show they lacked privity or knowledge of the conditions. *Petition of Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996). "Privity or knowledge" extends beyond actual knowledge to the knowledge that the ship owners could have obtained by a reasonable investigation. *The Matter of Central Gulf Lines*, 176 F.Supp.2d 599, 619 (E.D.La. 2001) (*citing Brister v. AWI, Inc.*, 946 f2d 350, 358 (5th Cir. 1991)). "A corporate owner, however, will not satisfy its burden by merely demonstrating ignorance. It is charged with the knowledge of any of its managing agents who have authority over the sphere of activities in question." *Id.* "Managing agents" are those agents who have authority over the specific sphere of activities which results in liability. *Id.* at 618 (*citing Kristie Leigh,* 72 F.3d at 481). More specifically, a "managing agent" is "an executive officer, manager or superintendent whose scope of authority included supervision over the phase of business out of which the loss or injury occurred, and whose authority, 'extended to the basic business decisions made by the . . . supervisors and president of the company.'" *Id.* (*citing Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993)). Whether or not the knowledge of such employees can be imputed to the corporation is a fact intensive inquiry. *In re: Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir. 2001). "[I]t is the 'extent of the employee's responsibility,

not his title [that] determines whether" his knowledge is imputed to the vessel owner. *Id.* (*quoting Continental Oil Co. v. Bonanza*, 706 F.2d 1365, 1367 (5th Cir. 1983)).  The factors that are considered in determining whether an employee is a "managing agent" in his sphere of operations are: (1) the scope of his authority over day-to-day activities in the relevant field of operations; (2) the relative significance of this field of operations to the business of the corporation; (3) his ability to hire or fire other employees; (4) his power to negotiate and enter into contracts on behalf of the company; (5) his authority to set prices; (6) his authority over the payment of expenses; (7) whether his salary is fixed or contingent; and, (8) the duration of his authority, i.e. full-time or restricted to a specific shift.  *Id.* (*citing Cupit,* 1 F.3d at 348).

A ship owner is generally not charged with the actions or knowledge of its competent crew members or master in the operation of the vessel at sea.  *See Complaint of Banker's Trust Co.*, 651 F.2d 160 (3rd Cir. 1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1436, 71 L.Ed.2d 653 (1982); *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982).  Also, a "master's mistake is not the fault of the shipowner 'simply because the master has been given broad and unlimited agency powers over the operation and maintenance of the vessel.'" *Continental Oil Co.*, 706 F.2d at 1376 (*quoting Admiral Towing v. Woolen (The Tug Companion)*, 290 F.2d 641, 648 (9th Cir. 1961)).  Rather,

it must be established that the captain is a "managing agent" with respect to the filed of operations in which the negligence occurred. *Id.*

Thus, in order to be permitted to limit their liability, Ingram, Unique and Domino must prove that nobody in each corporation had privity or knowledge of any alleged negligence or unseaworthiness that occurred.  All of these corporations argue that none of their "managing agents" had privity or knowledge of any alleged negligence.  Furthermore, they assert that anybody in each company who may have had privity or knowledge of any alleged negligence was not a "managing agent," in other words, that those individuals are not high enough in the corporate structure of each respective company to impute his knowledge to the company.

## INGRAM

The claimants argue that Ingram had or should have had knowledge of the state of the ING4727's moorings on the date in question because Ingram's employee, Cook, visited LNA's New Orleans, Louisiana facility.  They assert that Cook was a "managing agent" of Ingram and that any knowledge he had is attributable to Ingram for the purposes of privity or knowledge.  As mentioned above, Cook went to LNA to check the barge covers on Ingram's barges.  Cook was not asked, nor did he testify, at trial as to whether or not he saw the moorings that held the ING4727 to the ING4745 or in what

position the barges were moored when he was at LNA.  Thus, there is no evidence that he had such knowledge that could potentially be attributed to Ingram.

The claimants also contend that Cook should have checked the ING4727's moorings.  They argue that, with reasonable investigation, Cook could have obtained knowledge of the allegedly negligent mooring of the ING4727.  Cook testified that he did not discuss his visit to LNA with any Ingram employee.  Testimony of Stanley Cook.  Thus, if he could have obtained this information, his knowledge can only be imputed to Ingram if he is a "managing agent" of the company.  As mentioned above, a "managing agent" is "an executive officer, manager or superintendent whose scope of authority included supervision over the phase of business out of which the loss or injury occurred, and whose authority, 'extended to the basic business decisions made by the . . .  supervisors and president of the company.'" *Id.* (*citing Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir. 1993)).

Cook was not a "managing agent" of Ingram.  His status at Ingram is analogous to that of the toolpusher in *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d at 348.  The toolpusher in *Cupit* had authority to over the drilling operations, during his shift, when the rig was stationary and drilling.  *Cupit*, 1 F.3d at 348. There were other toolpushers with similar authority on other rigs and he had no authority to dictate when and where

the next drilling job would begin. *Id.* The *Cupit* Court observed that the toolpusher's authority "did not extend to the basic business decisions made by the drilling supervisors and the president of the company." *Id.* Similarly, Cook had no authority to make basic business decisions made by his supervisors or the president of the company. He had no ability to hire or fire employees, could not set prices or pay expenses and his salary was not contingent on the company's performance. *See Hellenic*, 252 F.3d at 395. Although he could enter contracts valued up to $10,000 on Ingram's behalf, this authority was relatively small in a company the size of Ingram.[6]  *See Id.*  Furthermore, Cook's title alone, "Area Maintenance Manager" for Apalachicola, Florida to Brownsville, Texas, does not make him a "managing agent." *See Id.*

In sum, Cook, the only Ingram employee to visit LNA at the time in question, did not testify that he had any knowledge of the mooring of the ING4727.  Also, he did not tell anyone at Ingram headquarters anything about the ING4727's moorings. Furthermore, even if Cook could have discovered any alleged negligence regarding the mooring of the ING4727, his knowledge is not attributable to Ingram, because he is not a "managing agent."   Thus, Ingram did not have privity or knowledge of any alleged

---

[6]        Ingram is the largest barge fleet in the United States.  Testimony of David Sehrt.

negligence regarding the actual moorings of the barge.

Similarly, Ingram has shown by a preponderance of the evidence that it did not have privity or knowledge of Zito's alleged negligence in failing to retrieve the ING4727 on August 27, 2005.  At trial, Busch testified that he always called Zito, not Ingram, when Ingram barges needed to be retrieved and that he did exactly that in this case.  Also, Barry Boudreaux, the Zito dispatcher on duty, did not testify that he had any contact with Ingram on that date.  Furthermore there is nothing in the Service Agreement between Ingram and Zito which states that Zito has to contact Ingram if it cannot pick up one of its barges and nobody testified that there was a policy for Ingram and Zito to check in with each other regarding the moving of Ingram's barges.  As a result, Ingram has proven by a preponderance of the evidence that it did not privity or knowledge of Zito's alleged negligence in failing to retrieve the ING4727 on August 27, 2005.

Although Ingram has proven by a preponderance of the evidence that it did not have privity or knowledge of the actual state of the moorings of the ING4727 at the time of Hurricane Katrina and Zito's alleged negligence in not retrieving the barge, it can still potentially be precluded from limiting its liability.  The claimants have stated many other putative acts of negligence and conditions of unseaworthiness that allegedly

14

caused the ING4727 to break away from her moorings.  *See* Rec. Docs. 620, 669 and 67.

Ingram has not proven by a preponderance of the evidence that it lacked privity or

knowledge of all of these putative acts of negligence and conditions of unseaworthiness.

More specifically, Ingram has not shown by a preponderance of the evidence that it

lacked privity or knowledge: (1) that the ING4727 was delivered to LNA as Hurricane

Katrina was approaching; (2) of the USCG and statutory regulations and

recommendations for hurricane preparedness and that it did not discharge its alleged

duties thereunder; (3) that it did not move the ING4727 out of harm's way; (4) that it

did not have a written hurricane plan; (5) of the ING4727's alleged unseaworthiness in

failing to have adequate mooring lines; or, (6) that Cook allegedly did not make a

reasonably inquiry into the ING4727's safety.[7]  The evidence and testimony presented at

trial tends to show that Ingram did have privity or knowledge that the ING4727 was

delivered to LNA. *See* Exhibit 108.  Also, Ingram's Senior Vice President Chief

Operations Officer, David Sehrt ("Sehrt"), testified that Ingram did not have a written

---

[7]     As mentioned above, Cook did not discuss his visit to LNA with any
Ingram employee and he was not a "managing agent."  Even if he had been directed to
inspect the moorings, no "managing agent" was aware that he allegedly did not.
However, there was no evidence presented as to whether a "managing agent" could
have discovered this information with a reasonable inquiry. Therefore, Ingram cannot
be held to have proven by a preponderance of the evident that it lacked privity or
knowledge of this putative negligence.

hurricane plan and that he knew about the allegedly applicable USCG and statutory rules and regulations.[8] Sehrt and Ingram's Senior Vice President of Customer Service, Pankaj Shah, also testified that Ingram relies on third parties who are in possession of their barges to look after the safety of the barges.[9] This testimony leads to the conclusion that Ingram knew that it took no action toward the ING4727, such as removing it from the LNA facility.[10]

Ingram's failure to prove by a preponderance of the evidence that it lacked privity or knowledge of all of the putative acts of negligence and conditions of unseaworthiness does not completely eliminate its potential ability to limit its liability.

---

[8]     Neither evidence nor testimony was presented at trial to show whether or not David Sehrt was a "managing agent" of Ingram, so the Court cannot determine whether or not any privity or knowledge that he may have had is attributable to the company.  However, the Court suspects that he was in fact a "managing agent."

[9]     Neither evidence nor testimony was presented at trial to show whether or not Pankaj Shah was a "managing agent" of Ingram, so the Court cannot determine whether or not any privity or knowledge that he may have had is attributable to the company.  However, the Court suspects that he was in fact a "managing agent."

[10]     The Court notes that Ingram, relying on a bailment theory and its Transportation agreement with LNA, asserts that it did not have a duty to take any action toward the ING4727, such as checking her moorings or moving her, while she was in LNA's possession.  The transportation Agreement supports Ingram's argument. *See* Exhibit 101, Transportation Agreement between Ingram and Lafarge, Paragraphs 34 and 36.  Nevertheless, the Court presumes this was negligence for the purposes of this stage of the proceedings.

The claimants still carry the burden of proving by a preponderance of the evidence whether these putative acts of negligence and conditions of unseaworthiness actually constituted negligence or unseaworthiness and that they *caused* the ING4727 to break away from her moorings.  However, the determinations of negligence, unseaworthiness and cause are reserved for later phases of these proceedings.

### UNIQUE AND DOMINO

The claimants also argue that Unique and Domino knew or should have known about the state of the moorings of the ING4727 and that the M/V REGINA H did not removed the barge from LNA's facility on the date in question.  At trial, Captain Grabert and Thigpen testified that they knew that the ING4727 was moored to the ING4745 with three single part lines.  They also testified that they did not tell Domino's dispatcher on duty, Castaing, or anyone else about the ING4727's mooring lines. Testimony of Captain Grabert and Eric Thigpen.  Captain Grabert testified that he only told Castaing that the job had been completed as request by LNA.  The claimants argue that Captain Grabert's and/or Thigpen's knowledge is attributable to Unique and Domino or that Unique and Domino could have discovered what transpired at LNA with reasonable inquiry.

Captain Grabert's and Thigpen's knowledge is only attributable to Unique and

Domino if they are "managing agents" of the companies.  On August 27, 2005, Thigpen

was a deck hand on the M/V REGINA H.  Testimony of Eric Thigpen.  He was not an

executive officer, manager or superintendent of any kind, so any knowledge he had

cannot be imputed to the companies.  Although Captain Grabert had more

responsibility than Thigpen, he is not a "managing agent" either.  Captain Grabert

testified that he was responsible for the operation of the M/V REGINA H when he was

on duty aboard the vessel.  He also testified that he had no authority to hire or fire

employees, pay bills, determine the vessel's next job or set rates and that his salary was

fixed, i.e. not contingent upon the company's performance.  In sum, Captain Grabert

lacked the ability to make "basic business decisions."  *See Hellenic*, 252 F.3d at 398 (5th

Cir. 2001); *see also Continental Oil Co.*, 706 F.2d at 1375 (vessel's captain held to be a

"managing agent" because he was authorized to seek out and negotiate contracts

independently, had a "carte blanche" to carry out scuba diving charters, decided which

repairs and purchases to make, hired the crew and received a commission for each trip,

rather than a fixed salary.)  As a result, any privity or knowledge that Captain Grabert

had regarding the state of the ING4727's moorings, that the barge was not removed

from LNA or any other putative negligence or unseaworthiness is not attributable to

Unique and Domino.

18

As mentioned above, Captain Grabert phoned Castaing when the LNA job was completed. At that point Castaing knew that the barges had been flipped. There is no evidence that he knew how they were moored. The claimants assert that he could have discovered this information with a reasonable inquiry. However, even if Castaing could have discovered the information, his privity or knowledge cannot be imputed to Unique and Domino, as he is not a "managing agent." Castaing could not hire or fire employees, make contracts, set prices or pay bills and he had a fixed salary. *See Hellenic*, 252 F.3d at 395; Testimony of David Castaing.

Because Thigpen, Captain Grabert and Castaing are not "managing agents," Unique and Domino could only be held to have privity or knowledge of the state of the ING4727's moorings and that she was not removed from LNA if a "managing agent" could have discovered this information with a reasonable inquiry. The claimants assert that Heck, Unique's president, and McNeill, Domino's president, should have discovered this information. Basically, the claimants argue that this was an emergency situation and that Captain Grabert and/or Castaing should have called them to report the situation. Even if Captain Grabert and/or Castaing should have called Heck and/or McNeill, there is no reason to assume that Heck and/or McNeill should have called Captain Grabert and/or Castaing. Both Heck and McNeill relied on their employees to

19

handle their every day business.  Even though Hurricane Katrina was approaching, there is no reason to assume that they should have called to ask about the jobs that the vessel was performing.[11] Thus, Unique and Domino did not have privity or knowledge of the state of the ING4727's moorings or that she was not moved from LNA's facility.

Although Unique and Domino have proven by a preponderance of the evidence that they did not have privity or knowledge of the actual state of the moorings of the ING4727 at the time of Hurricane Katrina or that she was not removed from LNA's facility, they can still potentially be precluded from limiting their liability.  The claimants have stated other putative acts of negligence and conditions of unseaworthiness that allegedly caused the ING4727 to break away from her moorings. *See* Rec. Docs. 620, 669 and 67.  Unique and Domino have not proven by a preponderance of the evidence that they lacked privity or knowledge of all of these putative acts of negligence and conditions of unseaworthiness.  More specifically,

---

[11]      No evidence was submitted at trial regarding Captain Grabert's competence.  The Court notes that the claimants assert that the crew of the M/V REGINA H was "ill prepared."  However, Captain Grabert testified that he was familiar with Domino's manual.  Also, the plaintiffs presented no evidence which calls Captain Grabert's competence into question.  Thus, any mistake by Grabert, was not Heck's mistake. *See Continental Oil Co.*, 706 F.2d at 1376.  This assessment may change if evidence is introduced in a later phase which shows that Captain Grabert was not a reliable captain.

Unique and Domino have not shown by a preponderance of the evidence that they lacked privity or knowledge: (1) that the M/V REGINA H's was unseaworthy because the crew was ill prepared and the vessel lacked the requisite mooring lines; (2) that the M/V REGINA H's crew did not report emergencies to Domino as was allegedly required; and, (3) that the M/V REGINA H's crew was not in compliance with Domino's policies and procedure's manual.

Unique's and Domino's failure to prove by a preponderance of the evidence that they lacked privity or knowledge of all of the putative acts of negligence and conditions of unseaworthiness does not completely eliminate their potential ability to limit their liability. The claimants still carry the burden of proving by a preponderance of the evidence whether these putative acts of negligence and conditions of unseaworthiness actually constituted negligence or unseaworthiness and that they *caused* the ING4727 to break away from her moorings. However, the determinations of negligence, unseaworthiness and cause are reserved for later phases of these proceedings.

## CONCLUSION

In light of the foregoing,

IT IS ORDERED that Ingram Barge Company is unable to limit its liability at this stage of the proceedings. However, this is not a final determination on limitation of

21

liability.  The Court must still determine whether the putative negligent acts and unseaworthy conditions advanced by the claimants actually were negligent acts or unseaworthy conditions and whether those negligent acts or unseaworthy conditions caused the ING4727 to break free from her moorings.

IT IS FURTHER ORDERED that Unique Towing, Inc. and Joseph C. Domino, Inc. are unable to limit their liability at this stage of the proceedings.  However, this is not a final determination on limitation of liability.  The Court must still determine whether the putative negligent acts and unseaworthy conditions advanced by the claimants actually were negligent acts or unseaworthy conditions and whether those negligent acts or unseaworthy conditions caused the ING4727 to break free from her moorings.

New Orleans, Louisiana this 18th day of July, 2007.


HELEN G. BERRIGAN

UNITED STATES DISTRICT JUDGE