# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**IN THE MATTER OF THE**                         **CIVIL ACTION**
**COMPLAINT OF INGRAM BARGE**
**COMPANY, AS OWNER OF THE**                **No. 05-4419**
**ING4727, PETITIONING FOR**
**EXONERATION FROM OR**                     **SECTION "C"**
**LIMITATION OF LIABILITY**

## OPINION

Phase II, the negligent actions or unseaworthy conditions, of this matter has been

conducted without live testimony.  The Court relied on the evidence submitted during Phase I of

the proceeding, as well as the memoranda, briefs, and exhibits submitted by the parties for Phase

II.[1]  Having considered the testimony and evidence presented, the record and the law, the Court

---

[1] In a limitation of liability proceeding, the court embarks on a two-part inquiry: "[i]nitially, the court must determine which acts of negligence or conditions of unseaworthiness caused the accident.  Second, the court must determine whether the shipowner had knowledge or privity of the same acts of negligence or conditions of unseaworthiness."  *Verrett v. McDonough Marine Service*, 705 F.2d 1437, 1444 (5th Cir. 1983) (citing *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976).  Due to the complexity of this matter, the Court reversed the process and addressed "privity and knowledge" in Phase I.  Phase I of this matter was tried before the Court, without a jury, on June 4, 2007 and June 5, 2007.  Following Phase I, the Court found that Ingram had "proven by a preponderance of the evidence that it did not have privity or knowledge of the actual state of the moorings of the ING4727 at the time of Hurricane Katrina and [Zito Fleeting's] alleged negligence in not retrieving the barge."  *In re Ingram Barge Co.*, 2007 WL 2088369, at *6 (E.D.La. July 19, 2007).  In addition, the Court found that Unique and Domino proved "by a preponderance of the evidence that they did not have privity or knowledge of the

finds that  Ingram Barge Company ("Ingram") is entitled to exoneration.  The Court also finds

that Unique Towing, Inc. ("Unique") and Joseph C. Domino, Inc. ("Domino") may limit

liability.

<u>BACKGROUND</u>

As previously described by the Court, on Friday, August 26, 2005, a barge owned by

Ingram, the ING4727, arrived at Lafarge North America, Inc.'s ("LNA") New Orleans,

Louisiana facility on the Inter Harbor Navigational Canal ("IHNC").  The ING4727 was carrying

a full load of dry cement.  LNA's employees began unloading the cement at 12:20 p.m. on

August 26, 2005.  *See* Exhibit 102.  The unloading procedure was completed between 8:00 and

9:00 a.m. on August 27, 2005. Testimony of Edward Busch.

Sometime on Saturday, August 27, 2005, LNA's employees became aware that Hurricane

Katrina was forecasted to directly impact the New Orleans, Louisiana area.  *Id.*  At that time,

LNA personnel began to prepare for the storm.  As part of the preparation, the terminal

operations assistant and acting terminal manager, Edward Busch ("Busch") called Zito Fleeting

("Zito") and left a message for them to pick up the now empty ING4727.[2]  *Id.*  However, he did

not call Ingram to let them know that the barge was empty.  *Id.*  LNA did not receive a return

phone call from Zito, nor did Zito pickup the ING4727.  *Id.*

After the ING4727 was emptied, it remained moored to the LNA dock.  Another Ingram

---

actual state of the moorings of the ING4727 at the time of Hurricane Katrina."  *Id*. at *8.
However, the possibility remained that Ingram, Domino, and Unique could be liable regarding
the Claimants other putative acts of negligence and conditions of unseaworthiness.

[2] Zito is the fleeting company with which Ingram contracts for the delivery, pickup and
fleeting of its barges in the New Orleans, Louisiana area.

barge, the ING4745 was moored to the other side of the ING4727.  *Id.*  At that time, the

ING4745 was full.  Busch, a man with approximately twenty-three (23) years of experience in

the wharfing of barges, determined that the mooring configuration of the ING4727 and the

ING4745 was unsafe.  *Id.*  Specifically, he was concerned that, with the predicted storm surge,

the empty ING4727 would not have enough slack to move freely if it were not moved to the

outside of the full ING4745.  *Id.*  Accordingly, at approximately 10:00 a.m. on August 27, 2005,

Busch contacted Domino, a marine transportation broker, to arrange for a tugboat to reverse, or

"flip," the positions of the ING4727 and the ING4745, so that the ING4745 would be next to the

dock and the ING4727 moored on the outside of the ING4745.  *Id.*  The only instruction Busch

gave Domino's dispatcher, David Castaing ("Castaing"), was to flip the barges.  Testimony of

Edward Busch and David Castaing.  He did not mention anything about the moorings that held

the ING4727 to the ING4745.  *Id.*

Castaing dispatched a tug owned by Unique, the M/V REGINA H, to flip the barges.

Testimony of David Castaing. He told the captain, Captain Raymond Grabert ("Captain

Grabert"), to report to LNA, flip the barges and secure the loaded barge, the ING4745, to the

dock. *Id.*  Castaing did not contact his supervisor or the M/V REGINA H's owner, Richard

Charles Heck ("Heck").  Testimony of David Castaing and Gerald McNeill.

The M/V REGINA H, with Captain Grabert and a deck hand, Eric Thigpen ("Thigpen"),

arrived at LNA's facility.  Testimony of Captain Grabert and Eric Thigpen.  The crew of the

M/V REGINA H did not encounter any LNA employees at the dock.  *Id.*  They found the

ING4727 moored to the dock and the ING4745 moored to the ING4727 with three single part

ropes.  *Id.*  The tug successfully flipped the barges and moored the ING4745 to the dock.  *Id.*

Captain Grabert then asked Thigpen if there was enough slack to make the lines between the barges two part lines, which Thigpen told him there was not.  Testimony of Eric Thigpen.  There were extra mooring lines aboard the M/V REGINA H, for securing tows and to provide to customers who request and pay for them.  Testimony of Captain Grabert.  However, LNA did not request or pay for additional mooring lines, so Captain Grabert sent Thigpen to the LNA dock to search for more lines.  Testimony of Captain Grabert and Eric Thigpen.  Thigpen found one additional rope and used it to further secure the ING4745 to the dock.  Testimony of Eric Thigpen.  Captain Grabert phoned Castaing when the job was finished.  Testimony of David Castaing and Captain Grabert.  Captain Grabert told Castaing that the job was completed, but did not mention anything about the moorings that held the ING4727 to the ING4745 or any other details of the job at LNA.  *Id.*

Also, on August 27, 2006, Stanley Vernon Cook ("Cook"), Ingram's maintenance manager for the Apalachicola, Florida to Brownsville, Texas area went to the LNA facility in New Orleans, Louisiana.  Testimony of Stanley Cook.  Cook testified that he was at LNA to check the barge covers and provide extra line to tie them down if necessary.[3]  He also testified that he was not there to inspect the barges or their moorings.  When Cook returned to his office in Reserve, Louisiana, he did not notify anyone at Ingram about what had transpired at LNA.[4]  *Id.*

_____

[3] Barge covers are fiberglass covers which are used to cover the cargo that is being carried by an otherwise open hatch barge.

[4] Cook was not asked nor did he testify at trial as to whether or not he saw the moorings that held the ING4727 to the ING4745 or in what position the barges were moored when he was at LNA.

4

Hurricane Katrina made landfall on August 29, 2005.  Sometime during or after the storm struck, the ING4727 broke free from her moorings.  The ING4727 was later found in the Lower Ninth Ward of New Orleans, Louisiana.  The Claimants, residents of the affected areas, allege that the ING4727 broke through the flood wall of the IHNC and caused flooding in the Lower Ninth Ward and parts of St. Bernard Parish, Louisiana.  The vessel owners filed their limitation of liability proceedings asserting exoneration from liability.  Indeed, the vessel owners claim that the incident and all resultant damages were not caused by the fault of the vessels or any person over which the vessel owners had control.  *See* Rec. Doc. 1 and Rec. Doc. 1 of consolidated proceeding 06-3313.

Due to the complexity of this action, the Court determined that the matter would be tried in phases.  Rec. Doc. 210.  Phase I addressed the privity or knowledge of the parties who asserted admiralty petitions for limitation of liability.  *Id.*  Phase I concluded when the Court determined Ingram had proven that it had neither privity nor knowledge of the actual state of the moorings of the ING4727 at the time of Hurricane Katrina.  *In re Ingram Barge Co.*, 2007 WL 2088369, at *6 (E.D.La. July 19, 2007).  The Court also found that Ingram had neither privity nor knowledge of Zito's alleged negligence in not retrieving the barge.  *Id.*  In addition, the Court found that Unique and Domino proved "by a preponderance of the evidence that they did not have privity or knowledge of the actual state of the moorings of the ING4727 at the time of Hurricane Katrina."  *Id*. at *8.

However, the Court left open questions of negligence or unseaworthiness and Ingram's, Unique's and Domino's knowledge of them for Phase II.  The Claimants have identified the following list of allegations regarding Ingram's negligence or unseaworthiness: (1) that the

5

ING4727 was delivered to LNA as Hurricane Katrina was approaching; (2) of the USCG and statutory regulations and recommendations for hurricane preparedness and that it did not discharge its alleged duties thereunder; (3) that it did not move the ING4727 out of harm's way; (4) that it did not have a written hurricane plan; (5) of the ING4727's alleged unseaworthiness in failing to have adequate mooring lines; or, (6) that Cook did not make a reasonably inquiry into the ING4727's safety.  Regarding Unique and Domino, the Claimants make the following three (3) assertions as possible means of precluding limitation of liability: (1) that the M/V REGINA H was unseaworthy because the crew was ill prepared and the vessel lacked the requisite mooring lines; (2) that the M/V REGINA H's crew did not report emergencies to Domino as was allegedly required; and, (3) that the M/V REGINA H's crew was not in compliance with Domino's policies and procedure's manual.

For Phase II, the Court assumes, without finding, that the actions or omissions of LNA were negligent or constituted unseaworthiness, and that these negligent acts or omissions caused the barge to break free of its mooring.  In other words, the Court now undertakes the determination of whether the vessel owners are liable under *Reliable Transfer*,[5] or insulated from accountability due to the failure of the Claimants to prove negligence.  The Court notes that for this phase of the proceedings, the Claimants begin with the burden of proving by a preponderance of the evidence that the putative acts of negligence and conditions of

---

[5] *U.S. v. Reliable Transfer Co., Inc.*, 421 U.S. 397 (1975) (adopting comparative fault principle over longstanding admiralty rule that liability was to be divided equally, regardless of fault).

unseaworthiness actually constituted negligence or unseaworthiness.[6]  To succeed, it must be shown that the putative acts *caused* the ING4727 to break away from her moorings.[7]

## LIMITATION OF LIABILITY

Ingram, Unique and Domino argue that their liability should be limited to the post-incident values of the ING4727 and the M/V REGINA H, respectively, pursuant to 46 U.S.C. § 30505, *et seq*.  The language of the statute allows for limitation of liability when the vessel owner[8] has no privity or knowledge of the acts which caused the damage.  46 U.S.C. § 30505. As found in Phase I, the vessel owners had knowledge or privity of certain putative acts of negligence leading up to Hurricane Katrina's landfall.  The critical issue at this phase of the proceedings is whether the Claimants can prove that the putative acts of negligence and conditions of unseaworthiness actually constituted negligence or unseaworthiness.[9]  In order for

---

[6] *See e.g., In re Hellenic Inc*., 252 F.3d 391, 394 (5th Cir. 1995) (stating "once the claimant establishes negligence or unseaworthiness, the burden shifts to the owner of the vessel to prove that negligence was not within the owner's privity or knowledge."); *Carr v. PMS Fishing Corp*., 191 F.3d 1, at *4 (1st Cir. 1999) (noting "both the claimant's and the shipowner's burdens contemplate proof by a fair preponderance of the evidence.").

[7] *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646 (5th Cir. 1992) (stating, "[u]nder the general maritime law, a party's negligence is actionable only if it is a 'legal cause' of the plaintiff's injuries.").

[8] The Court notes that Domino is not a vessel "owner," but rather a marine transportation broker.  However, the Court found in Phase I that Domino was an "owner" for the purposes of limitation of liability because Domino exercised dominion over one of the vessels in this matter. *In re Ingram Barge Co.*, 2007 WL 2088369, at *3 (E.D.La. July 19, 2007) (citing *Complaint of B.F.T. No. Two Corp.*, 433 F.Supp. 854, 871-73 (E.D.Pa.1977); *In re Oil Spill By the AMOCO CADIZ*, 954 F.2d 1279, 1302 (7th Cir.1992); *Birmingham Southeast LLC v. M/V MERCHANT PATRIOT*, 124 F.Supp.2d 1327, 1388-39 (S.D.Ga.2000)).

[9] See FN 6, citing: *In re Hellenic Inc*., 252 F.3d 391, 394 (5th Cir. 1995); *Carr v. PMS Fishing Corp*., 191 F.3d 1, at *4 (1st Cir. 1999).

the Claimants to prove negligence, they must demonstrate that the putative acts were proximate[10] causes of the ING4727 breaking free from her moorings.  *See e.g., Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 832 (1996) (stating that "the requirement of legal or 'proximate' causation, and the related 'superceding cause' doctrine, apply in admiralty.").

<u>**INGRAM**</u>

As an initial matter, the Claimants argue that the burden of negligence should shift to Ingram, such that Ingram should have to disprove negligence because of the Drifting Vessel Doctrine.[11]  In opposition, Ingram asserts that the Drifting Vessel Doctrine is inapplicable as against Ingram because a bailment was created when custody of the ING4727 was delivered to LNA.  On that basis, Ingram argues that LNA, as the bailee, assumed the duty to exercise reasonable care of the barge.  Ingram points to the text of the Transportation Agreement ("TA") between Ingram and LNA to demonstrate that LNA was solely responsible for properly mooring

---

[10] In *Exxon Co., U.S.A.*, the Supreme Court quoted the Second Circuit and Schoenbaum on *Admiralty and Maritime Law* to describe the doctrine of "proximate cause:"

> the careless actor will [not] always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous-that what is claimed to be consequence is only fortuity. Thus, if the [negligent] destruction of the Michigan Avenue Bridge had delayed the arrival of a doctor, with consequent loss of a patient's life, few judges would impose liability.

*Exxon Co., U.S.A.*, 517 U.S. at 838, 39.

[11] *See e.g., Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967) (holding that when a moving vessel collides with a fixed object, there is a prima facie case of negligence against the moving vessel).

the barge.[12]  Furthermore, Ingram relies on cases such as *Dow Chemical Co. v. Barge UM-23B*, 424 F.2d 307 (5th Cir. 1970) for the proposition that barge owners should be exonerated when their vessel is under the care and custody of a wharfinger and breaks loose from its moorings.  In *Barge UM-23B*, the court found that the wharfinger "was not an insurer of the [UM-23B] entrusted to its care; it was, however, a bailee for hire and was required to see to it that the barges were adequately moored at all times."  *Barge UM-23B*, 424 F.2d at 311 (citing *John I. Hay Co. v. The Allen B. Wood*, E.D.La.1954, 121 F.Supp. 704, *aff'd sub nom*, *Martin Oil Service, Inc. v. John I. Hay Co.*, 5 Cir. 1955, 219 F.2d 237; *Federal Barge Lines, Inc. v. Star Towing Company, Inc*., E.D.La.1967, 263 F.Supp. 981)).

The Claimants argue that a bailment was not created between Ingram and LNA because Ingram did not relinquish both possession *and* control of the vessel.  The Claimants rely on cases such as *T.N.T. Marine Services, Inc. v. Weaver Shipyards and Dry Docks, Inc*., 702 F.2d 585 (5th Cir. 1983) to note that a bailment cannot arise unless the bailee "has exclusive right to possession of the bailed property, even as against the property owner."  *T.N.T. Marine Services, Inc*., F.2d at 588.  The Claimants point to the fact that Ingram had access to the barge when Cook

---

[12] The TA states that Ingram:

> shall deliver an empty or leaded barge to a loading/unloading facility designated by [LNA] for leading or unloading. [LNA] shall assume the duty and responsibility for the safety of each barge in its possession.  For the purposes of this agreement, "possession" shall begin when Carrier delivers an empty or loaded barge for leading or unloading to the landing designated by [LNA] and shall end when the barge is removed by [Ingram] or its agents. [LNA] shall be responsible for the safekeeping of [Ingram's] barge delivered to a landing regardless of whether [LNA] owns or operates the landing.

Ingram Trial Exhibit No. 1, ¶ 34.

conducted his inspection of the hatch covers on August 27, 2006.  In addition, the Claimants

maintain that Ingram had constructive custody of the ING4727, and that at most, a limited

bailment was created.  The Claimants assert that pursuant to *Smith v. Burnett*, 173 U.S. 430

(1899), there is a duty on both the bailee and bailor to exercise reasonable care under a limited

bailment.[13]  On these grounds, the Claimants argue that Ingram's duty of reasonable care was not

completely transferred to LNA, and thus, the Drifting Vessel Doctrine applies to Ingram.

In this matter, the Court is not convinced that the Drifting Vessel Doctrine applies to

Ingram.  In addition, the Court finds that a bailment analogous to that in *Barge UM-23B* was

present, such that the wharfinger, LNA, was solely responsible for the duty of reasonable care

relating to the ING4727 when Hurricane Katrina made landfall.[14]  As the Fifth Circuit held in

*Noonan*, even a limited bailee's liability "depend[s] exclusively on the obligations which he has

himself undertaken in his contract with the owners of vessels entrusted to his care."  *Noonan*,

---

[13] The claimants also rely on *Noonan Const. Co. v. Federal Barge Lines, Inc*., 453 F.2d
637 (5th Cir. 1972) to argue that the arrangement between LNA and Ingram was merely a
limited bailment.  However, this Court is not convinced that *Noonan* supports the Claimants'
position.  The court in *Noonan* specifically analogizes that case to *Barge UM-23B*, stating:

> Similarly, in *Dow Chemical Company v. Barge UM-23B*, 5 Cir., 1970, 424
> F.2d 307, we found that '[t]he owners and operators surrendered the
> custody and control of their barges to Cargo Carriers relying on its
> expertise as a wharfinger,' particularly in regard to the mooring of the
> barges. Thus, [the wharfinger] was the party best situated to prevent
> accidents occasioned by faulty moorings. When a loss occurred because of
> insufficient moorings, we held [the wharfinger] accountable.

*Noonan*, 453 F.2d at 641.

[14] The Court draws support for its position that LNA was essentially a "bailee for hire" as
in *Barge UM-23B* from the testimony of Daniel Mecklenborg.  Rec. Doc. 768, p. 12-14.
Mecklenborg testified that the LNA-Ingram contract was negotiated, in part, such that LNA
would bear the costs for maintaining the barge.

453 F.2d at 640.

In *T.N.T.*, the Fifth Circuit quoted BLACK'S LAW DICTIONARY to define "bailment" as:

"A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust." *T.N.T. Marine Service, Inc.*, 702 F.2d at 588. The evidence presented in this matter shows that a bailment was created. Under the Transportation Agreement, LNA, the wharfinger, assumed the duty to care for the ING4727 while it was moored at LNA's facility. Again, the contract language states: "[LNA] shall assume the duty and responsibility for the safety of each barge in its possession . . . [LNA] shall be responsible for the safekeeping of [Ingram's] barge delivered to a landing regardless of whether [LNA] owns or operates the landing." Ingram Trial Exhibit No. 1, ¶ 34. Therefore, a bailment arose because a delivery of property, by one person to another, in trust and upon a contract occurred in this case. The fact that Ingram had access to the vessel does not undo the bailment to the point that Ingram had joint responsibility for the ING4727 while it was moored at LNA's wharf. Indeed, the bailment, based on the plain language of the underlying contract, was sufficient to transfer the duty of reasonable care regarding the barge from Ingram to LNA.[15] Accordingly, the

---

[15] In *Rodi Yachts, Inc. v. National Marine, Inc.*, 984 F.2d 880 (7th Cir. 1993), a barge broke free from its mooring and the court was charged with partitioning fault between the barge owner and the dock operator. Judge Posner opined that "[t]he language of presumptions and bailments obscures rather than illuminates the ultimate question, which is that of the relative fault of the parties." *Rodi Yachts*, 984 F.2d at 883. In that case, the Seventh Circuit attempted to set default rules for comparative negligence "in the absence of an explicit contract between the parties." *Id.* Judge Posner focused on the "relative costs of prevention" finding that, after the

11

Drifting Vessel Doctrine is not applicable to Ingram.

Furthermore, the Claimants reliance on cases such as *T.N.T. Marine Service, Inc*. and *Smith v. Burnett* is misplaced because the cases are not controlling.  In *T.N.T.*, the court specifically stated, "[i]n this case we find no written document in the record that can be said to constitute a contract between the litigants for a bailment."  *T.N.T. Marine Service, Inc*., 702 F.2d at 588.  Clearly, LNA and Ingram had a contract making LNA responsible for "the safety of each barge in its possession."  In  *Smith v. Burnett*, a vessel was destroyed while it was docked at a wharf because there was a rock in the water under the ship's berth.  The rock punctured the ship's hull as the vessel drafted more water while taking on cargo.  The *Smith* court discussed respective responsibilities for dangerous objects in the water near a wharf, not the responsibility to secure mooring lines.  *Smith*, 173 U.S. at 433.

### 1. Duty to Not Deliver the Vessel

The Claimants' first allegation of negligence independent of the responsibility for mooring, is that it was negligent for Ingram to deliver the ING4727 to LNA as Hurricane Katrina was approaching.  While the Court agrees that delivery of the barge to LNA was a "but for" cause of the barge breaking away from its mooring, the Court finds that mere delivery of the barge on Friday August 26, 2005 was not a proximate cause of the injury to the Claimants.  As

---

vessel was moored, responsibility shifted to the wharfinger to regularly inspect the mooring lines.  *Id.* at 884.  Again, the matter under review is distinguishable because there was an explicit contract between LNA and Ingram; however, *Rodi Yachts* adds weight to this Court's determination because it is authority for the proposition that even absent an agreement, a wharfinger is responsible for the vessel after mooring.

discussed by the Fifth Circuit in *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*,[16] proximate

cause is related to superceding cause doctrine, which "applies where the defendant's negligence

in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about

by a later cause of independent origin that was not foreseeable." *Stolt Achievement*, 447 F.3d at

367. In this matter, it was not reasonably foreseeable that the ING4727 would break free from

its moorings because it was not forecasted for Hurricane Katrina to strike New Orleans on

August 26, 2005. At that time, the USCG had not issued any alerts or bulletins for New Orleans,

and the harbor was open for commercial traffic.[17] Thus, the mere fact that the barge was

delivered to LNA cannot be a proximate cause of the ING4727 breaking free from its mooring.

Accordingly, it was not negligent for Ingram to deliver the barges to LNA on Friday August, 26,

2005.

### 2. United States Coast Guard Regulations and Recommendations

The Claimants argue that Ingram failed to discharge its duties under the United States

Coast Guard's ("USCG") regulations and/or the Maritime Hurricane Contingency Port Plan

(MHCPP"). In this matter, the applicable USGC regulations all relate to the responsibility for

the mooring of the barge. As discussed in Phase I of this case, Ingram did not have knowledge

---

[16] 447 F.3d 360 (5th Cir. 2006).

[17] Ingram Phase II Trial Exhibit, No. 14, Impact Weather statement; Ingram Phase II Trial Exhibit No. 19B, "Amended Response to Phase II Request for Admission." Request for Admission No. 11 states, "Admit that when the barges ING4745 and ING4727 were delivered to [LNA] at 11:25 a.m. on Friday, August 26, 2005, the United States Coast Guard Sector New Orleans had not issued Port Condition Whiskey." Request for Admission No. 12 states, " Admit that when barges ING4745 and ING4727 were delivered to [LNA] at 11:25 a.m. on Friday, August 26, 2005, the United States Coast Guard Sector New Orleans had not issued a bulletin or order that "waterfront facilities ... halt cargo operations."

or privity of the ING4727's mooring conditions at LNA.  However, the Claimants argue that 33

C.F.R. § 165.803[18] makes Ingram liable for the barge as a "person in charge" of the vessel.

Furthermore, the Claimants state that the MHCPP specifically recommends that "mooring lines

[should be] doubled up with due consideration given to the effects of storm surge."[19]  As

discussed above, the Court was not persuaded that LNA and Ingram shared responsibility for the

barge after the ING4727 was delivered to LNA.  The text of the Transportation Agreement

transferred responsibility of the barge solely to LNA.  Thus, Ingram did not have any duty under

the USCG regulations with respect to the ING4727 while the barge was in LNA's custody.

Accordingly, Ingram is not negligent under the USGC's regulations.

### 3. Ingram's Failure to Move the Barge Prior to Hurricane Katrina's Landfall

As discussed in Phase I of the proceedings, Ingram had no knowledge or privity of Zito's

failure to move the barge after Busch called to have the ING4727 removed.  Thus, there are no

grounds to deny Ingram exoneration for Zito's failure to move the barge.  In the alternative, the

Claimants position could be viewed as an assertion for negligence because Ingram itself did not

move the barge.

Similar to the discussion above regarding the delivery of the barge to LNA, the Court is

---

[18] Section 165.803 provides regulations governing the portion of the Mississippi River at issue in this case.  In part, the regulation states, "'Person in charge' includes any owner, agent, pilot, master, officer, operator, crewmember, supervisor, dispatcher or other person navigating, controlling, directing or otherwise responsible for the movement, action, securing, or security of any vessel, barge, tier, fleet or fleeting facility subject to the regulations in this section. 33 C.F.R. § 165.803(a)(7).

[19] Exhibit 23, "Recommended Precautionary measures for Barges," Annex B, Appendix 2.

not convinced that a failure to remove the barge was a proximate cause of the incident.  As described during the trial, Busch called Zito to remove the barge; but, neither Zito nor Busch notified Ingram that there was a failure to remove the barge.  Because Ingram never assumed Zito's duty to remove the barge, it fails as a matter of law that Ingram was negligent for Zito's failure.  Moreover, failing to remove the barge was not a proximate cause of the injury.  The Court notes that there were other barges present at the LNA facility, including other LNA barges.  There was no evidence that these other barges broke free from their moorings, or caused injury simply because they were left under LNA's custody during the storm.  Accordingly, the Claimants have not proven by a preponderance of the evidence that Ingram was negligent for failing to remove the ING4727 from LNA's wharf.

### 4. Failure to Have a Written Hurricane Plan

The Claimants argue that Ingram was negligent for failing to have a written Hurricane Plan.  Ingram admits that it did not have a written Hurricane Plan, but that it relied on Senior Vice President Chief Operations Officer, David Sehrt ("Sehrt") to direct Ingram's hurricane planning process.  During the trial, Sehrt testified that he was in charge of Ingram's hurricane preparedness planning and that he conducted regular meetings "to adapt[] our hurricane process to where the storm trajectory was said it was going to be."[20]  Further, Sehrt testified that no Coast Guard regulation, nor any trade organization requirement mandated that Ingram maintain a written Hurricane Plan.[21]  This testimony was uncontroverted.  The Claimants noted that a Coast Guard safety bulletin issued on Saturday August 27, 2005, included the statement: "You are

---

[20] Direct Testimony of Sehrt, Rec. Doc. 883, p. 109.

[21] *Id.* at 109-20.

strongly encouraged to review your existing hurricane plan or develop a plan if you do not have one."[22]  Clearly, there was no regulatory duty mandating that Ingram possess, maintain, or follow a written Hurricane Plan.  The Court finds that Ingram's informal hurricane preparedness process, spearheaded by Sehrt, was reasonable under the circumstances.[23]

### 5. Unseaworthiness of the ING4727

The Claimants assert that the ING4727 was unseaworthy because of the alleged inadequacy of the three single part lines that moored the ING4727 to the ING4745.  However, testimony was presented at trial that LNA supplied the mooring lines that held the ING4727 in place prior to Hurricane Katrina's landfall.[24]  Furthermore, even the Claimants' expert, Commander Green, testified that the ING4727 carried "adequate rigging."[25]  Therefore, there is no evidence that the ING4727 was unseaworthy when delivered to LNA because it was not equipped with adequate mooring lines.

### 6. Unreasonable Training and Inquiry

The Claimants aver that Cook did not make a reasonable inquiry into the ING4727's

---

[22] Ingram Phase II Trial Exhibits, No. 28, "Marine Safety Bulletins," IBCO-0710.

[23] The Court notes that Ingram was not negligent, under these circumstances, by failing to have a written Hurricane Plan.  However, the Court encourages Ingram to contemplate the range of possibilities that could have helped to prevent this incident as a continuum stretching between "negligent" and "reasonable" conduct.  A written hurricane plan that clearly delineates tasks and responsibilities would help Ingram move further into the realm of "reasonableness."  *See American River Transp. Co. v. Paragon Marine Services, Inc*., 213 F.Supp. 10351048-49 (E.D.Mo. 2002) (comparing negligence of defendants versus plaintiffs on basis of written plans for barge safety).

[24] Rec. Doc. 883, Testimony of Edward Busch, p. 50.

[25] Rec. Doc. 700, Testimony of Commander Green, p. 39.

safety when he inspected the barge covers on Saturday August 27.  As described in Phase I, Cook went to LNA to check the barge covers on Ingram's vessels.  Cook was not asked, nor did he testify at trial as to whether or not he saw the moorings that held the ING4727 to the ING4745 or in what position the barges were moored when he was at LNA.  Indeed, there was no evidence that Cook had knowledge of the mooring lines, or that Cook's level of knowledge could be attributed to Ingram.

Furthermore, the level of Cook's training or expertise in mooring lines is not material to this matter.  As Cook testified, mooring lines were "not his area of expertise."[26]  Because Cook did not need any expertise regarding mooring lines to perform his duties for Ingram, Ingram cannot be negligent for providing limited training to Cook.[27]  In addition, the trial testimony shows that Cook observed the barges before they were "flipped," and thus, he had no knowledge of the mooring lines as the barges rested in their final position before Hurricane Katrina made landfall.  Therefore, even assuming that Cook was improperly trained, neither his training nor observations of the lines were proximate causes of the ING4727 breaking free from LNA's facility.

## UNIQUE AND DOMINO

### 1. Seaworthiness of the M/V REGINA H

The Claimants argue that the M/V REGINA H was unseaworthy because the crew was ill prepared and the vessel lacked the requisite mooring lines to properly secure the ING4727.  At

---

[26] Rec. Doc. 789, Testimony of Stanley Cook, p. 16.

[27] The Court finds that Ingram was reasonable even if it provided no training to Cook regarding mooring lines.

trial, Captain Grabert and Thigpen testified that they knew that the ING4727 was moored to the ING4745 with three single part lines.  They also testified that they did not tell Domino's dispatcher on duty, Castaing, or anyone else about the ING4727's mooring lines.  Testimony of Captain Grabert and Eric Thigpen.  Captain Grabert testified that he only told Castaing that the job had been completed as request by LNA.  The testimony of Captain Grabert and Thigpen demonstrated that, based on their knowledge and experience, they were well trained.[28]  There was no evidence to controvert the preparedness of the M/V REGINA H and her crew.  The vessel carried sufficient rigging to be in compliance with Domino's policy and procedures.[29]  In addition, the Court notes that the crew of the M/V REGINA H neither secured the two Ingram barges together before the "flip," nor did the crew adjust the lines between the barges during the "flip."  Indeed, the crew of the M/V REGINA H was not requested to make any changes to the lines securing the two barges together.[30]  Accordingly, there is insufficient evidence to demonstrate that the M/V REGINA H, or her crew was unseaworthy.

### 2. The M/V REGINA H's Crew Failed to Report Emergencies

The Claimants allege that the Domino policies and procedure manual required the M/V REGINA H to advise Domino of any problem encountered during the "flip."  On that basis, the Claimants argue that the crew of the M/V REGINA H was negligent for failing to advise Domino that the mooring lines securing the ING4727 were inadequate.

---

[28] Captain Grabert had been a licensed captain for more than 21 years.  Rec. Doc. 699, p. 5.  Thigpen had between four and five months of experience.  Rec. Doc. 701, p. 4.

[29] Red. Doc. 699, p.9-10.

[30] Rec. Doc. 883, Testimony of Edward Busch, p, 50-54.

The Domino Policy and Procedure manual contains a list of the problems that must be reported.  Specifically, Section 6.010 states that "the wheelman on watch ... must institute the provisions of the Joseph C. Domino, Inc. Emergency response plan" when he "experiences one of the emergency situations listed ... 3.1.1 collisions/allisions; 3.1.2 groundings; 3.1.3 spills, whether on deck or in the water; 3.1.4 personal injury; 3.1.5 serious or potentially serious illness; 3.1.6 fire on board the towing vessel or barge; 3.1.7 hurricane; 3.1.8 major mechanical or structural failure."[31]  It is undisputed that the crew of the M/V REGINA H did not encounter any of the enumerated conditions or events that would have required reporting when they "flipped" the barges.  The argument that they should have reported the fact that they noticed the mooring lines were insufficient to hold the ING4727 is compelling; however, the Court is not convinced that the crew of the M/V REGINA H had a duty to report on the condition of the mooring lines.

### 3. The M/V REGINA H's Crew Failed to Comply with Domino's Policies and Procedure Manual

The Claimants final allegation of negligence or unseaworthiness against the M/V REGINA H is that the crew failed to comply with the "Hurricane Preparedness" section of Domino's Policy & Procedure Manual.  Section 7.080 of Domino's Policies and Procedures Manual states that the crew of the M/V REGINA H should "add additional rigging if necessary" for proper Hurricane Preparedness.  The testimony of Captain Grabert and Thigpen was that the "Emergency Response Procedures" contained in Domino's manual regarding "Hurricane Preparedness" did not apply at the time that the M/V REGINA H "flipped" the barges because Hurricane Katrina was still more than 30 hours away from New Orleans, and the M/V REGINA

---

[31] Group A Exhibits, Phase I, Vol. 3, No. 345, Joseph C. Domino Policies and Procedures, Section 6.010.

H did not have custody of the ING4727 at the time of the storm.[32]

Captain Grabert's testimony clearly established that he made the decision not to add any additional line between the ING4727 and the ING4547.[33]   However, Captain Grabert's testimony also shows that he was concerned about the mooring lines between the two vessels because he sent Thigpen to search for additional line to secure the vessels.[34]   Even in the absence of manuals dictating policies and procedures to "add additional rigging" for hurricane preparedness, courts have found tugs liable for failing to properly secure barges after moving some barges within a fleet to tow other barges away.   *See e.g., American River Transp. Co. v. Paragon Marine Services, Inc.,* 213 F.Supp. 1035 (E.D.Mo. 2002); *Federal Barge Lines, Inc. v. Star Towing Co.*, 263 F.Supp. 981 (D.C.La. 1967); *Lower River Ship Services, Inc v. Casteel, Inc*., 1991 WL 13867 (E.D.La. January 30, 1991).   The Court finds that the "flip" performed by the M/V REGINA H in this matter is factually analogous to the maneuvering of barges described by these cases.

The court in *American River* held that "[a] tug that removes a barge from a fleeting area, moving other barges in the process, is bound to ensure that remaining barges are properly secured and that all mooring lines affected by the movement are proper and fast."[35]   Indeed, the

---

[32] Rec. Doc. 699, Testimony of Captain Grabert, p. 16.

[33] *Id*. at p. 12.

[34] *Id.* at p. 32-33.

[35] *American River Transp. Co. v. Paragon Marine Services, Inc.,* 213 F.Supp. 1035, 1055 (E.D.Mo. 2002) (citing *Dow Chem. Co. v. barge* UM-*23B,* 287 F.Supp. 661 (E.D.La. 1968); *Federal Barge Lines, Inc. v. Star Towing Co.*, 263 F.Supp. 981 (D.C.La. 1967); *Lower River Ship Services, Inc v. Casteel, Inc*., 1991 WL 13867 (E.D.La. January 30, 1991)).

*American River* court found that barge fleeters and shifting tugs shared a duty "to inspect tie-offs and insure that they are fast and secure after barges in a fleet are shifted."[36]  The facts of *American River* demonstrated that the crew of the defendant tug did not check the mooring lines "between the ING 5565 and ING 5561 to insure they were secure" after the tug had shifted the vessels.[37]  On that basis, the court found the crew of the tug was negligent as a matter of law.[38]

Similar to *American River*, the facts in this matter show that the crew of the M/V REGINA H, the "shifting tug," did not properly secure the barges after moving them.  The record in this case shows that Captain Grabert was concerned about the way in which the ING4727 was secured because he sent Thigpen to search for additional lines.  Indeed, Captain Grabert had additional line at his disposal on the M/V REGINA H, but he chose not to use this line because LNA had not paid for the additional rigging.[39]  In addition, Captain Grabert testified that he knew Hurricane Katrina was approaching New Orleans.[40]

It is clear that the crew of the M/V REGINA H had the duty, as well as the opportunity, to help secure the ING4727 with additional line; yet, they chose neither to act, nor to report the deficiency.  This was negligence.  The Court finds that if the single part mooring lines were a proximate cause of the ING4727 breaking free, then, the crew's negligence was a cause of that circumstance.  Indeed, as the court found in *Star Towing*, "on [that] particular day [the M/V

---

[36] *Id*. at 1057.

[37] *Id.*

[38] *Id*.

[39] Rec. Doc. 699, Testimony of Captain Grabert, p. 34.

[40] *Id*. at p. 37-38.

REGINA H] was in a better position than [LNA] to make the barges secure after the maneuvers."[41]

Specifically, the crew of the M/V REGINA H was negligent for failing to follow Domino's policies and procedures by failing to properly secure the ING4727's mooring lines after they "flipped" the vessels because they knew the risk that Hurricane Katrina posed to the barges as they lay.  However, in Phase I, the Court found that "Unique and Domino did not have privity or knowledge of the state of the ING4727's moorings."[42]  Therefore, Unique and Domino may still limit their liability.  Although the crew of the M/V REGINA H failed to follow Domino's policies and procedures, the failure concerned the mooring of the ING4727.  Because Unique and Domino proved by a preponderance of the evidence that they did not have privity or knowledge of the actual state of the moorings of the ING4727, they are entitled to limited liability.

<u>CONCLUSION</u>

In light of the foregoing,

IT IS ORDERED that Ingram Barge Company is GRANTED exoneration of any negligence, and hence have no liability to limit.

IT IS FURTHER ORDERED that Unique Towing, Inc. And Joseph C. Domino are entitled to limitation of liability, but not exoneration.

Counsel for Ingram, Unique, and Domino shall prepare a judgment, in conformity with

---

[41] *Star Towing*, 263 F.Supp. At 984.

[42] *In re Ingram Barge Co.*, 2007 WL 2088369, at *8 (E.D.La. July 19, 2007)

this opinion with respect to their liability, and forward a copy to counsel for the Claimants, for approval as to form.

The remaining matter of whether Unique Towing, Inc. and Joseph C. Domino's negligence was an actual cause of the ING4727 breaking free of its mooring and/or whether the ING4727 striking the floodwall was an actual cause of the breach in the Industrial Canal wall shall be transferred to Section K as part of the *Katrina Canal Breaches Consolidated Litigation*, No. 05-4182.

New Orleans, Louisiana this 31st day of March, 2008.


_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE